AMERICAN FAMILY MUTUAL INSURANCE COMPANY,
Plaintiff-Appellant,

David RONALDSON, Involuntary-Plaintiff,

v.

David GOLKE, Joseph Golke, Charles Golke, Golke
Brothers Roofing and Siding LLC and Indiana
Insurance Company, Defendants-Respondents,

ELLINGTON MUTUAL INSURANCE COMPANY,
Intervenor-Defendant.

Supreme Court

*No. 2006AP3003. Oral argument December 2, 2008.
—Decided July 15, 2009.*

2009 WI 81

(Also reported in 768 N.W.2d 729.)

For the plaintiff-appellant there were briefs by *Charles W. Kramer, Monte E. Weiss,* and *Deutch & Weiss, LLC,* Milwaukee, and oral argument by *Charles W. Kramer.*

For the defendants-respondents, Joseph Golke, Charles Golke, and Golke Brothers Roofing and Siding, LLC, there was a brief filed by *Michael P. Konz, Erik L.*

*Fuehrer,* and *Gabert, Williams, Konz & Lawrynk, LLP,* Appleton, and oral argument by *Michael P. Konz.*

For the defendants-respondents, David Golke and Indiana Insurance Company, there was a brief by *Peter M. Farb* and *the Law Offices of Thomas P. Stilp,* Appleton, and oral argument by *Peter M. Farb.*

An amicus curiae brief was filed by *Ryan L. Woody, Gary L. Wickert,* and *Matthiesen, Wickert & Lehrer, S.C.,* Hartford, on behalf of the National Association of Subrogation Professionals.

An amicus curiae brief was filed by *Arnold P. Anderson* and *Mohr & Anderson, LLC,* Madison, on behalf of the Wisconsin Reinsurance Corporation.

¶ 1. MICHAEL J. GABLEMAN, J. This is an appeal pursuant to Wis. Stat. § 809.61 (2007–08)[1] in which American Family Insurance Co. ("American Family") seeks review of the judgment of dismissal entered by the Circuit Court for Waupaca County, Raymond S. Huber, Judge.

¶ 2. American Family brought a cause of action against three brothers—David, Joseph, and Charles Golke, Golke Brothers Roofing and Siding LLC, and Indiana Insurance Co. ("Indiana Insurance")[2] for damages alleged to have arisen from negligent roof repairs. American Family claimed that the Golkes' negligent roof repair caused a fire that damaged a home owned by its insured, the Ronaldsons. The circuit court found that American Family had failed to preserve any por-

---

[1] All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

[2] For convenience, we refer to these defendants-respondents collectively as "the Golkes" in this opinion. Where distinctions are appropriate, we will refer to the relevant party or parties by name.

tion of the pertinent roof or chimney sections when it knew or should have known that litigation was likely. The circuit court further found that American Family did not give the Golkes sufficient notice of a claim against them or of the impending destruction of the fire scene. Concluding that this amounted to improper destruction of evidence, or "spoliation," the circuit court dismissed American Family's suit as a sanction for spoliation and entered judgments in favor of all defendants.

¶ 3. American Family appealed, and the court of appeals certified two questions to us. First, under what circumstances may evidence crucial to a potential legal claim be destroyed? Second, what notice must be given to a civil litigant before such evidence is destroyed? The certification by the court of appeals also discussed the proper standard for imposing the sanction of dismissal for spoliation.

¶ 4. We therefore address the following issues: (1) When does a party or potential litigant discharge its duty to preserve evidence relevant to a potential legal claim; (2) Can sufficient notice be effectuated by the mailing of a letter via first-class mail; and (3) When is dismissal an appropriate sanction for spoliation of evidence?

¶ 5. We conclude that the duty to preserve relevant evidence is discharged when a party or potential litigant with a legitimate reason to destroy evidence provides reasonable notice of a possible claim, the basis for that claim, the existence of evidence relevant to the claim, and a reasonable opportunity to inspect that evidence. We further hold that such notice can be properly effectuated by mailing a letter via first-class mail. We also affirm that dismissal is an appropriate sanction for spoliation of evidence only if a party acts

403

egregiously—that is, in a conscious effort to affect the outcome of litigation or in flagrant, knowing disregard of the judicial process. Applying the law to the facts of this case, we conclude that as a matter of law, Joseph and Charles Golke received the March 13, 2000, letter, and that American Family provided the Golkes with reasonable and sufficient notice, thereby discharging its duty to preserve the evidence from the fire. The circuit court therefore erroneously exercised its discretion when it dismissed American Family's suit. Because American Family discharged its duty to preserve evidence and no sanctions are appropriate, the judgment of the circuit court is reversed, and the cause is remanded to the circuit court for trial on the merits.

## I. FACTS

¶ 6. On February 13, 2000, fire damaged a home owned by David and Lori Ronaldson. The home was insured by American Family, which appointed a field examiner, Albert Hlavachek, and a fire origin and cause expert, Todd Haltaufderheid, to handle the case. On February 14, 2000, they inspected the home and concluded that the fire began near a metal chimney that extended through the roof. After further investigation, Haltaufderheid discovered that the three Golke brothers—David, Joseph, and Charles—had performed roof repairs on the Ronaldson home in 1994.

¶ 7. When the Golke brothers performed construction on the Ronaldson's home, they were all working together in one partnership. This partnership was insured by Indiana Insurance until 1997 when the partnership dissolved. After the partnership dissolved, David Golke continued to perform construction work as a sole proprietor and retained Indiana Insurance as his insurance provider. Joseph and Charles Golke formed a

new partnership, later transformed into a limited liability company, which was insured by Ellington Mutual Insurance.

¶ 8. On February 22, 2000, Haltaufderheid met with Charles Golke at Joseph and Charles Golke's business address. During that meeting, Haltaufderheid confirmed that the construction work on the Ronaldson home was performed by the Golkes. Haltaufderheid later concluded that their actions had reduced the clearance between the chimney and the wood underlying the roof, and that this reduced clearance allowed the hot chimney to heat the surrounding wood to the point of ignition, leading to the fire that damaged the home. American Family determined that repair was not possible, and that the home would have to be demolished and rebuilt.

¶ 9. On March 13, 2000, Hlavachek, the American Family field examiner, mailed letters to the Golkes after he learned of their involvement with the roof construction.[3] One copy was mailed to David Golke; the other copy was mailed to Joseph and Charles Golke at their business address. This correspondence was sent via United States Postal Service first-class mail, not certified mail. The letter stated the date of the loss (3/13/2000), the name of the insureds (the Ronaldsons), the address of the home, that the loss of property resulted from fire, and that the amount of loss was pending. The body of the letter stated in full as follows:

> This letter is to put you and your roofing company on notice for the fire damage that occurred on the above date of loss. Our investigation determined that you

---

[3] The parties dispute whether the March 13, 2000, letter was actually sent to Joseph and Charles Golke. We address this further below.

405

were negligent for work performed on our insured's property at the above loss location.

If you have a liability insurance carrier, please forward this letter to them and we will handle these matters directly with them. If you do not have a liability insurance carrier, we will expect you to pay for the repairs/replacement. The amount of repairs/replacement at this time is pending.

To provide adequate time for yourself or your liability carrier to conduct a proper investigation, any destruction of the fire damaged building will not take place until April 1, 2000.

¶ 10. David Golke admitted receiving this letter, which he forwarded to his insurer, Indiana Insurance. Indiana Insurance sent a response letter to American Family on March 17, 2000, acknowledging the potential claim but denying coverage.[4] On March 23, 2000, American Family replied to both Indiana Insurance and David Golke by letter recommending that they investigate the fire scene if they so desired because American Family was "planning demolition to begin on April 1, 2000."

¶ 11. American Family did not receive any response to the March 13, 2000, letter from Joseph or Charles Golke or any insurer on their behalf. Though not denying receipt, Joseph and Charles Golke claimed not to recall receiving the March 13, 2000, letter. Charles Golke testified at trial that he and Joseph Golke had experienced some difficulty in securing accurate and reliable mail service at their business address.

---

[4] Indiana Insurance later determined that it did cover David Golke with respect to this claim.

¶ 12. On April 6, 2000, Hlavachek sent a second letter, this time via United States Postal Service certified mail, with copies being sent to both David Golke, and Joseph and Charles Golke at their business address. This second letter also stated the date of the loss, the name of the insureds, the address of the home, that the loss of property resulted from fire, and that the amount of loss was pending. The body of the letter provided:

> This is our second request for insurance information concerning your liability regarding the above loss.
>
> All losses must be reported to your insurance company on a timely basis. Failure to do so may result in denial of your coverages due to your failure to meet policy conditions.
>
> You will need to contact your current insurance carrier and have them contact us as soon as possible.

¶ 13. Both David and Joseph Golke admitted that they received copies of the second letter. At trial, Joseph Golke initially claimed not to recall receiving the second letter, but when confronted with his signature on the delivery receipt, admitted that he received it on April 7, 2000. Charles Golke also admitted receiving that letter. Charles Golke called Hlavachek in response to the letter on April 8, 2000, leaving a message for him. Hlavachek returned Charles Golke's message that same day at 5:37 p.m., but there was no answer, and Hlavachek did not leave a message.

¶ 14. None of the three Golke brothers, the limited liability roofing company, the insurers, or anyone else on their behalf contacted American Family to arrange for inspection of the burned home, nor did anyone (or any defendant) request an extension of the

inspection period. American Family's adjuster testified that he "definitely" would have granted an extension if so requested.

¶ 15. Although American Family's first letter stated that demolition of the home would occur on April 1, 2000, the demolition and rebuilding did not begin until sometime after April 11, 2000.[5] Neither American Family nor its experts preserved any physical evidence of the roof, chimney, or any other part of the fire scene. The Golkes urge that American Family's failure to preserve physical evidence, such as the chimney and surrounding roof sheathing, fell short of applicable fire investigation industry standards as articulated in the National Fire Protection Association's Publication 921 and the American Society for Testing and Materials' publication E 1188–95—both of which state that fire inspectors should preserve physical evidence from a fire scene.[6] American Family, however, did retain many photographs and drawings of the fire scene produced by its experts who inspected the home before its demolition. American Family shared these materials with the Golkes and their fire experts during discovery.

## II. PROCEDURAL HISTORY

¶ 16. Despite additional attempted contacts, American Family heard nothing from the Golkes and brought suit on March 14, 2003, against David, Joseph, and Charles Golke, Golke Brothers Roofing and Siding

---

[5] The record is unclear as to the precise dates of both demolition and commencement of construction on the new home.

[6] David Golke and Indiana Insurance Company asked this court to take judicial notice of this publication or supplement the record with it. We deny the motion.

LLC, and Indiana Insurance for damages arising from the fire.[7] All defendants filed motions for an order dismissing American Family's claims for spoliation of evidence. The circuit court denied the motions and the case proceeded to a bench trial on the issues of spoliation and sufficiency of notice. At the conclusion of the evidentiary portion of the trial, the defendants renewed their motions, arguing that American Family's claims should be dismissed for spoliation. The circuit court then dismissed American Family's claims as a sanction for its failure to preserve any physical evidence.

¶ 17. American Family appealed, contending that the circuit court erred in dismissing its cause without first finding that American Family acted egregiously. American Family asserted that its actions were not egregious, and that dismissal of its cause was an erroneous exercise of discretion. Pursuant to Wis. Stat. § 809.61, the court of appeals certified the aforementioned questions to this court.

### III. STANDARD OF REVIEW

¶ 18. Under Wis. Const. art. VII, § 3(3), by accepting the certified appeal, we acquire jurisdiction of the entire appeal, not merely the questions certified. *State v. Stoehr,* 134 Wis. 2d 66, 70, 396 N.W.2d 177 (1986); Wis. Stat. §§ 808.05(2), 808.05(3), and (Rule) 809.61. We review the decision to impose sanctions for spoliation of evidence for erroneous exercise of discretion. *City of Stoughton v. Thomasson Lumber Co.,* 2004 WI App 6, ¶ 38, 269 Wis. 2d 339, 675 N.W.2d 487. Whether

---

[7] Ellington Mutual Insurance Co. later intervened and asserted that it provided no coverage for Joseph Golke, Charles Golke, or their limited liability roofing company.

a court applied the correct legal standard in exercising its discretion is a question of law which we review de novo. *Garfoot v. Fireman's Fund Ins. Co.*, 228 Wis. 2d 707, 717, 599 N.W.2d 411 (Ct. App. 1999).

## IV. DISCUSSION

¶ 19. Our initial task is to examine the questions addressed to us by the court of appeals. First, we discuss the standard for when a party or potential litigant discharges its duty to preserve relevant evidence. We conclude that this duty is discharged when a party or potential litigant with a legitimate reason to destroy evidence provides reasonable notice of a possible claim, the basis for that claim, the existence of evidence relevant to the claim, and reasonable opportunity to inspect that evidence prior to its destruction. Second, we address whether mailing a letter via first-class mail can constitute sufficient notice, answering the question in the affirmative. Third, we address when dismissal is an appropriate sanction for spoliation of evidence, concluding that dismissal is only appropriate if a party acts egregiously. After establishing the relevant legal standards, we apply them to the facts of this case and conclude that American Family had a legitimate reason to destroy evidence, and gave the Golkes reasonable and sufficient notice, thereby discharging its duty to preserve the evidence from the fire.

A.

¶ 20. The court of appeals first asked us to address the following: Under what circumstances may evidence crucial to a potential legal claim be destroyed? This question concerns when a party or potential litigant discharges its duty to preserve relevant evidence.

¶ 21. Every party or potential litigant is duty-bound to preserve evidence essential to a claim that will likely be litigated. *Sentry Ins. v. Royal Ins. Co. of Am.*, 196 Wis. 2d 907, 918, 539 N.W.2d 911 (Ct. App. 1995). Spoliation is the "intentional destruction, mutilation, alteration, or concealment of evidence." *Black's Law Dictionary* 1409 (7th ed. 1999). Courts have discretionary authority to sanction parties who destroy or withhold evidence relevant to pending or future litigation. *See* Estate of *Neumann v. Neumann,* 2001 WI App 61, ¶ 80, 242 Wis. 2d 205, 626 N.W.2d 821. These sanctions serve two main purposes: "(1) to uphold the judicial system's truth-seeking function and (2) to deter parties from destroying evidence." *Insurance Co. of N. Am. v. Cease Elec. Inc.,* 2004 WI App 15, ¶ 16, 269 Wis. 2d 286, 674 N.W.2d 886.

¶ 22. In the case at bar, the parties dispute whether the general duty to preserve relevant evidence may be discharged, and if so, what a party or potential litigant must do to discharge that duty. David Golke (along with his insurer, Indiana Insurance) argues that evidence must be preserved until and unless all parties consent to its destruction. American Family asserts that a party or potential litigant's duty to preserve evidence is discharged once it has given notice and an opportunity to test or inspect the evidence. Joseph and Charles Golke (along with their partnership, Golke Brothers Roofing and Siding LLC) appear to agree with American Family that the duty to preserve evidence may be discharged with proper notice regarding the claim and the impending destruction of evidence.[8]

---

[8] Joseph and Charles Golke do maintain, however, that American Family has not provided sufficient notice.

¶ 23. Though a question of first impression for this court, multiple jurisdictions have either directly or indirectly addressed the question of whether and under what preconditions a party or potential litigant may legitimately destroy relevant evidence. Several illustrative cases demonstrate a pattern.

¶ 24. In *Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.,* 473 F.3d 450, 458 (2d Cir. 2007), the Second Circuit considered a subrogation[9] claim for a home fire allegedly caused by a coffee maker. On the date of the fire, the insurer sent the defendant product manufacturer a letter notifying it of the potential claim and offering to preserve the fire scene for inspection. *Id.* at 457. The manufacturer sent a representative to the scene two weeks later, who indicated he wanted to preserve the remains of the coffee maker and a receptacle, not the range or range hood which were also potential causes of the fire. *Id.* The insurer then took detailed pictures of the range and range hood and discarded them after ruling them out as a cause of the fire. *Id.* However, the manufacturer's initial inspector passed away, and the new representative was unable to state conclusively that the range and range hood were not the causes of the fire without an opportunity to examine the discarded evidence. *Id.* at 453.

¶ 25. The U.S. District Court for the District of Vermont found that it would be inequitable to allow the

---

[9] Subrogation, the claim also at issue here, is a cause of action "[w]here one party is substituted for another whose debt the party pays, entitling the paying party to rights, remedies, or securities that would otherwise belong to the debtor." *Black's Law Dictionary* 1440 (7th ed. 1999). Here, American Family substitutes itself in place of the Ronaldsons and is allowed to pursue this action against third parties as if it stepped into the Ronaldsons' shoes.

insurer to use this evidence, and excluded it. *Id.* at 457. The insurer argued that this was effectively a sanction for spoliation, and that the district court's actions constituted an abuse of discretion because the insurer provided the manufacturer a "full and fair opportunity to examine the fire scene as well as the alternate potential ignition sources." *Id.* at 457–58. The Second Circuit held that the duty to preserve evidence was not perpetual, and that the district court abused its discretion by effectively sanctioning the insurer for spoliation of evidence even though it provided the manufacturer with a full and fair opportunity to inspect the evidence, and the defendant manufacturer disclaimed interest in that evidence. *Id.* at 458.

¶ 26. In another case on point, a homeowner made one phone call to a car dealer complaining that the car he bought from the dealer started on fire while in his garage, causing his home to burn down. *Hoffman v. Ford Motor Co.,* 587 N.W.2d 66, 68 (Minn. Ct. App. 1998). The homeowner did not make any claim or demand during his phone call, did not request or instruct the dealer to undertake an investigation, and did not indicate how the fire started or whether the car dealer or manufacturer may be liable. *Id.* at 70–71. Neither the homeowner nor his insurer ever informed the car dealer or manufacturer that they intended to pursue a claim against either of them, that the car and home were available for inspection, or that the car and home would soon be destroyed. *Id.* Before the car's manufacturer was given an opportunity to inspect them, the home was destroyed, the car had been allowed to corrode and degrade in a salvage yard for several months, and some of the car's parts that were allegedly the cause of the fire were damaged or lost. *Id.* at 71.

413

¶ 27. The *Hoffman* court concluded that "to be sufficient in content, a spoliation notice must reasonably notify the recipient of a breach or a claim." *Id.* at 70. The court equated the purposes of a notice of evidence spoliation to the purposes of the notice a purchaser owes to a seller as a precondition of bringing a U.C.C. claim for breach of warranty, explaining as follows:

> First, notice provides the seller a chance to correct any defect. Second, notice affords the seller an opportunity to prepare for negotiation and litigation. Third, notice provides the seller a safeguard against stale claims being asserted after it is too late for the manufacturer or seller to investigate them.

*Id.* (citing *Church of the Nativity of Our Lord v. Watpro, Inc.*, 491 N.W.2d 1, 5–6 (Minn. 1992)). The court concluded that the content of the phone call constituted insufficient notice. *Id.* at 72. It therefore excluded all evidence and testimony regarding the cause of the fire that derived from the insurer's investigation of both the car and garage as a sanction for spoliation. *Id.* As a result, the claim was dismissed for lack of evidence. *Id.*

¶ 28. Numerous other courts have outlined or suggested similar principles.[10] These cases reveal a loose consensus grounded in the idea that a party or

---

[10] *See, e.g., N. Assurance Co. v. Ware*, 145 F.R.D. 281, 284 (D. Me. 1993) (holding that "reasonable notice to likely adversaries" that the evidence was to be destroyed would be sufficient to prevent a sanction for spoliation); *Cooper v. United Vaccines, Inc.*, 117 F. Supp. 2d 864, 875 (E.D. Wis. 2000) (stating that the claim might not have been dismissed if the plaintiff had notified the defendant of its intention to engage in destructive testing of the evidence so that the defendant could have participated or conducted its own testing); *Howell v. Maytag*, 168 F.R.D. 502, 506 (M.D. Pa. 1996) (stating that "plaintiffs could reasonably

potential litigant may discharge its duty by giving the other side notice of a potential claim and a full and fair opportunity to inspect relevant evidence. We hold, therefore, that a party or potential litigant with a legitimate reason to destroy evidence[11] discharges its duty to preserve relevant evidence within its control by providing the opposing party or potential litigant: (1) reasonable notice of a possible claim; (2) the basis for that claim; (3) the existence of evidence relevant to the claim; and (4) reasonable opportunity to inspect that evidence.

¶ 29. The specific method or frequency of such notice is less significant. Rather, the trial court must use its own judgment, its own discretion, to determine whether the *content* of the notice is sufficient in light of the totality of the circumstances. Relevant facts might

have given [the defendant] notice of the potential claim, and provided it with an opportunity to conduct an independent investigation before the demolition of the fire scene."); *Baliotis v. McNeil,* 870 F. Supp. 1285, 1290–91 (M.D. Pa. 1994) (stating that relevant evidence should not be destroyed without giving the other party an opportunity for inspection); *Hirsch v. Gen. Motors Corp.,* 628 A.2d 1108, 1122 (N.J. Super. Ct. Law Div. 1993) (holding that a "potential spoliator need do only what is reasonable under the circumstances," which included allowing defendants a reasonable amount of time to inspect the evidence and giving notice of probable litigation (citation omitted)); *Hamilton Mut. Ins. Co. of Cincinnati v. Ford Motor Co.,* 702 N.E.2d 491, 493 (Ohio Ct. App. 1997) (holding that exclusion of expert testimony as a sanction for spoliation was improper because the defendant had been given multiple notices and opportunities to inspect the evidence and had indicated that it would not do so).

[11] In this case, American Family had a legitimate reason to destroy the home—the Ronaldsons needed a place to live.

include the length of time evidence can be preserved, the ownership of the evidence, the prejudice posed to possible adversaries by the destruction of the evidence, the form of the notice, the sophistication of the parties, and the ability of the party in possession of the evidence to bear the burden and expense of preserving it. This framework serves the judicial system's truth-seeking function and effectively prevents parties from prematurely destroying evidence. *See Insurance Co. of N. Am.,* 269 Wis. 2d 286, ¶ 16.

¶ 30. A rule that does not allow a party or potential litigant to discharge its duty to preserve evidence unless all other parties consent, as David Golke urges,[12] is neither practical nor fair. Such a rule would place the party in control of the evidence at the mercy of its adversary who would be indirectly rewarded for withholding its consent to destroy evidence. An adversary would have no incentive to either inspect the evidence or grant its consent to the destruction of evidence. This is to say nothing of the unfairness to insureds who (like the homeowners in this case) could be stuck in limbo while a court-endorsed and costly waiting game ensued between the parties. We cannot endorse a rule that encourages such brinkmanship.

B.

¶ 31. The second question the court of appeals certified to us is really a subset of the first: What notice must be given to a civil litigant before the evidence is

---

[12] He bases this assertion on the National Fire Protection Association and American Society for Testing and Materials standards which state that fire inspectors should preserve physical evidence from a fire scene.

416

destroyed? We have already answered the substance of this question, stating that notice sufficient to discharge the duty to preserve evidence requires: (1) reasonable notice of a possible claim; (2) the basis for that claim; (3) the existence of evidence relevant to the claim; and (4) reasonable opportunity to inspect that evidence.

¶ 32. We do wish to address one sub-point regarding notice that is particularly relevant under the facts of this case—whether notice can be effectuated via first-class mail, or whether some other method is required. This question is focused on the method of delivery of the notice, not the required content (which we have already addressed above). Joseph and Charles Golke argue that American Family has the burden to prove receipt of the March 13, 2000, letter, and that it did not meet this burden. Specifically, they assert that sufficient notice of this type must be either by personal service, as with a summons and complaint under Wis. Stat. § 801.11, or certified mail with a return receipt or reply required. American Family counters that first-class mail is a common and accepted form of notice throughout the law.

¶ 33. The legislature has long recognized that first-class mail service is an efficient mechanism that is reasonably calculated to provide actual notice of possible or pending litigation and effective alteration of substantive legal rights and interests. *See, e.g.,* Wis. Stat. § 631.36(2)(b)-(c) (providing for cancellation of insurance policies ten days after notice is sent by first-class mail); Wis. Stat. § 968.04(3)(b)2 (providing for a person's arrest on a warrant issued if he fails to appear for court as directed in a summons served by mail); Wis. Stat. § 48.977(4)(c)2 (providing for notice of a hearing on a petition to appoint a guardian for a child to be sent to the child's parents and others by first-class

mail); Wis. Stat. § 146.819(3)(a) (providing for the deletion or destruction of a patient's medical records 35 days after notice is sent by first-class mail).

¶ 34. Contrary to Joseph and Charles Golke's suggestion, even the commencing of multimillion dollar lawsuits may be effectuated by sending the summons and complaint via first-class mail if personal service is not possible. *See* Wis. Stat. § 801.11(1)(c). The service of pleadings and other papers in a lawsuit may also be accomplished through first-class mail. *See* Wis. Stat. § 801.14(2). Both the legislature and this court[13] have affirmed the sufficiency of notice by mail in a variety of circumstances.

¶ 35. Notice by mail is usually considered complete not upon proof of receipt, but upon mailing. *See id.* ("Service by mail is complete upon mailing."); *see also* Wis. Stat. § 891.46 ("[n]otices . . . required or authorized to be served by mail in judicial or administrative proceedings are presumed to be served when deposited in the U.S. mail with properly affixed evidence of prepaid postage."); *Mansfield v. Smith,* 88 Wis. 2d 575, 588, 277 N.W.2d 740 (1979) (discussing the "mailbox rule," that acceptance of a contract is effective upon mailing, and noting that "[m]ailing is sufficient to satisfy the legal requirements imposed in the day-to-day conduct of business").

¶ 36. Accordingly, evidence of mailing a letter raises a rebuttable presumption that the addressee received the letter. *See State ex rel. Flores v. State,* 183 Wis. 2d 587, 612, 516 N.W.2d 362 (1994) ("It is well established that the mailing of a letter creates a pre-

---

[13] *State ex rel. Flores v. State,* 183 Wis. 2d 587, 612–14, 516 N.W.2d 362 (1994).

sumption that the letter was delivered and received.").[14] Once the presumption of mailing has been established, the burden shifts to the party challenging receipt to present credible evidence of non-receipt. *Id.* at 613. The presumption may not be overcome without a denial of receipt. *Id.* If receipt is denied, the issue is a credibility question to be resolved by the factfinder. *Id.* Mere non-remembrance of receipt is not enough; the presumption of receipt cannot be overcome without denial.[15] *See id.*

¶ 37. In sum, notice can be effectuated by first-class mail, and evidence of mailing creates a presumption of receipt that may create an issue for the factfinder only by denial of receipt.

[14] *See also, State v. Kemp,* 106 Wis. 2d 697, 709, 318 N.W.2d 13 (1982) (referring to "the presumption of receipt from mailing"); *Greene v. Donner,* 198 Wis. 122, 126, 223 N.W. 427, (1929) ("The presumption of the receipt of the notice which the law raises is a rebuttable presumption."); *Nack v. State,* 189 Wis. 633, 636, 208 N.W. 487 (1926) ("The copy of the letter was received on the theory that the mailing of the letter was presumptive evidence of its receipt. . . . [T]here was a presumption that defendant received the letter."); *Reeves v. Midland Cas. Co.,* 170 Wis. 370, 377, 174 N.W. 475 (1919) ("From the proof of mailing a presumption arises that [the notice] was received by the [addressee]."); *Mullen v. Braatz,* 179 Wis. 2d 749, 756, 508 N.W.2d 446 (Ct. App. 1993) ("The mailing of a letter creates a presumption that the letter was delivered," but the presumption is rebuttable.).

[15] Even in 1897, when this court held that mailing a letter was prima facie evidence of its receipt (rather than raising a presumption of receipt), an express denial of receipt was required to challenge the evidence. *McDermott v. Jackson,* 97 Wis. 64, 75, 72 N.W. 375 (1897) ("Defendant did not deny having received the letter. He said he did not remember having received it. That did not weaken the prima facie effect of the evidence.").

## C.

¶ 38. Though not a certified question, the court of appeals addressed additional questions to us regarding egregious conduct and spoliation sanctions. We will address the question of when a sanction of dismissal for spoliation is appropriate under Wisconsin law.

¶ 39. The decision to impose sanctions for improper spoliation of relevant evidence is generally within the trial court's discretion. *Milwaukee Constructors II v. Milwaukee Metro. Sewerage Dist.*, 177 Wis. 2d 523, 529, 502 N.W.2d 881 (Ct. App. 1993) (reversing the trial court's sanction of dismissal because the party's destruction of stored archived documents in the course of a cost-cutting initiative did not constitute egregious behavior). There has been some dispute, however, regarding when the sanction of dismissal is appropriate.

¶ 40. In 1993, the court of appeals examined whether the circuit court abused its discretion in dismissing a case after concluding that the claimant intentionally destroyed evidence. *Id.* The court concluded that dismissal was an extreme sanction that is only justified in cases of egregious conduct. *Id.* at 533. It stated that egregious conduct "involves more than negligence; rather, it consists of a conscious attempt to affect the outcome of the litigation, or a flagrant, knowing disregard of the judicial process." *Id.* The court of appeals ultimately concluded that the party's conduct, though volitional and negligent, was not a purposeful effort to impair discovery or affect the outcome of the litigation. *Id.* at 534–35. Because the party's actions were not egregious, the circuit court erroneously exercised its discretion when it dismissed the party's claims. *Id.*

¶ 41. In 1995, however, the court of appeals took up a similar claim and appeared to allow dismissal without a finding of egregious conduct. *Sentry Ins.*, 196 Wis. 2d at 917–18 (excluding evidence as a sanction for the plaintiff's destruction of the refrigerator that was thought to be the cause of a house fire). In 1999, the court of appeals attempted to harmonize the seemingly inconsistent rulings, and reaffirmed the requirement of egregious conduct as outlined in *Milwaukee Constructors II. See Garfoot*, 228 Wis. 2d at 723–24.

¶ 42. We affirm that dismissal as a sanction for spoliation is appropriate only when the party in control of the evidence acted egregiously in destroying that evidence. *Milwaukee Constructors II*, 177 Wis. 2d at 533. Egregious behavior is "a conscious attempt to affect the outcome of the litigation or a flagrant, knowing disregard of the judicial process." *Id.* Lesser spoliation sanctions, such as pre-trial discovery sanctions and negative inference instructions, however, may be appropriate for spoliation where a party violated its duty to preserve relevant evidence, but where the destruction of such evidence did not constitute egregious conduct. *See, e.g., id.* at 538; *Neumann*, 242 Wis. 2d 205, ¶ 80.

D.

¶ 43. In the interests of efficiency and finality, as well as to clarify the standards we have established, we now apply the facts of the case to determine whether the circuit court erroneously exercised its discretion in dismissing American Family's case as a sanction for spoliation of evidence. A circuit court properly exercises its discretion when it examines the relevant facts, applies a proper standard of law, and uses a demonstra-

bly rational process to reach a conclusion that a reasonable judge could reach. *Milwaukee Constructors II*, 177 Wis. 2d at 529–30.

¶ 44. We conclude that the circuit court applied an incorrect standard of law in dismissing American Family's claim because it did not make a finding of egregiousness before doing so. Moreover, we conclude that American Family's actions were not only not egregious, they were reasonable as a matter of law and so discharged its duty to preserve the evidence.

¶ 45. As outlined above, American Family was required to have a legitimate reason to destroy the evidence, and provide: (1) reasonable notice of a possible claim; (2) the basis for that claim; (3) the existence of evidence relevant to the claim; and (4) reasonable opportunity to inspect that evidence. Preliminarily, before addressing the sufficiency of the content of the notice, we must resolve whether notice was in fact given, and this requires us to examine whether Joseph and Charles Golke received the March 13, 2000, letter. Once this is established, we will examine the content of the notice under the above factors.

1. Did Joseph and Charles Golke Receive the March 13, 2000, Letter?

¶ 46. American Family claims that it sent letters on both March 13, 2000, and April 6, 2000. One copy of each letter was sent to David Golke, and a second copy of each letter was sent to Joseph and Charles Golke at their business address. David Golke admits receiving both letters, and Joseph and Charles Golke admit receiving the April 6, 2000, letter. Joseph and Charles Golke, however, do not recall receiving the March 13, 2000, letter. As we shall see, the uncontroverted evi-

dence demonstrates that, as a matter of law, Joseph and Charles Golke did receive the March 13, 2000, letter.

¶ 47. American Family's adjuster testified that he wrote the March 13, 2000, letter on his computer in his cubicle at American Family's office and placed it in his cubicle's outgoing mailbox. The adjuster's assistant was responsible for placing the letter in an envelope and placing postage on the envelope. On March 13, 2000, American Family's "routine, habit, and practice" was for an employee to check the adjuster's cubicle every hour during the work day and pick-up any outgoing mail. Outgoing mail was given to a mail delivery service at 3:00 p.m. or 3:30 p.m. The mail delivery service then delivered the outgoing mail to the post office for delivery of the mail to its ultimate destination.

¶ 48. Evidence of routine business practice is admissible for the purposes of showing that a particular action was in conformity with habit or routine practice. *See* Wis. Stat. § 904.06; 1A J. Wigmore, *Wigmore on Evidence* § 95 (Tillers rev. 1983). Joseph and Charles Golke provided no evidence that American Family's routine mailing practice was not followed or was in any way interfered with, prevented, or frustrated with regard to the March 13, 2000, letter. Joseph and Charles Golke also conceded that the business address listed in the letter's heading was their address at the time, and that they met with American Family's investigator at that address shortly before the letter was sent. Therefore, the unrebutted evidence is that American Family sent the March 13, 2000, letter to Joseph and Charles Golke in a properly addressed and postage-prepaid envelope.[16]

---

[16] This court has long held that implicit in testimony that a letter was mailed is the fact that "the letter was inclosed (sic) in

¶ 49. These facts are sufficient to raise a rebuttable presumption that the March 13, 2000, letter was not only sent, but was received by Joseph and Charles Golke. *State ex rel. Flores,* 183 Wis. 2d at 613. The presumption is strengthened by the fact that Joseph and Charles Golke concede receiving other mail from American Family at the address to which the March 13, 2000, letter was sent, namely, the April 6, 2000, letter. *See* 31A C.J.S. Evidence § 235 ("[T]he presumption may arise where a party admits to receiving another notice mailed to the same address."). The presumption is further strengthened by the fact that American Family's adjuster prepared an identical letter to David Golke on the same day using the same routine mailing practice for that letter as for the letter sent to Joseph and Charles Golke, and David Golke concedes that he received the copy of the March 13, 2000, letter sent to him. *See Id.* (explaining that when a letter is sent to each of two neighbors, and the first neighbor received the letter, a presumption arises that the second neighbor also received the letter).[17]

¶ 50. This presumption of receipt can only be rebutted by credible evidence of non-receipt, usually in the form of a denial that the letter was received. *See State ex rel. Flores,* 183 Wis. 2d at 613. Neither Joseph nor Charles Golke denied that they received the March 13, 2000, letter, however. Rather, they concede that they

_____

an envelope, properly addressed, [and] deposited in the postoffice (sic) with the postage duly prepaid." *Reeves,* 170 Wis. at 376.

[17] David Golke was not a neighbor of his brothers' business, but the principle that the receipt by one addressee of a letter sent simultaneously by the same sender of an identical letter to a second addressee strengthens the presumption that the second addressee also received the letter and that routine practice was followed.

may have received the letter, but cannot recall one way or the other. Non-remembrance, though, does not constitute denial, and does not rebut the presumption of receipt. *Id.*

¶ 51. Joseph and Charles Golke argue that the letter should not be presumed received because they allegedly had some difficulties receiving mail at their business, there is no affidavit of mailing, and the letter was sent via first-class rather than certified mail. None of these constitute a denial or credible evidence of non-receipt, and are therefore not enough to overcome the presumption of receipt. We therefore apply the law to the unrebutted facts and presume that Joseph and Charles Golke received American Family's letter dated March 13, 2000. Because notice was provided, we must examine whether the notice was sufficient to discharge American Family's duty to preserve the evidence.

2. Did American Family Discharge Its Duty to Preserve the Fire Scene Evidence?

¶ 52. In order to discharge its duty to preserve the evidence from the fire scene, American Family was required to have a legitimate reason to destroy evidence, and provide: (1) reasonable notice of a possible claim; (2) the basis for that claim; (3) the existence of evidence relevant to the claim; and (4) reasonable opportunity to inspect that evidence.

¶ 53. The March 13, 2000, letter, which David and (as we concluded above) Joseph and Charles Golke received, informed the Golkes that a fire occurred at a specific home on a specific date, and that the Golke brothers' negligent work at that home was believed to be the cause of the fire. The letter instructed the Golkes

to forward the letter to their insurers, and advised that American Family expected either the Golkes or their insurers, if applicable, to pay for the repairs to or replacement of the home. The letter concluded by offering the Golkes or their insurers an opportunity to conduct "a proper investigation" of the fire scene. It stated that destruction of the fire damaged building would be delayed until April 1, 2000, to allow for this inspection.

¶ 54. The April 6, 2000, letter to the Golkes stated that it was the second notice regarding the Golkes' liability for the fire damage at a specifically identified house. It also instructed the Golkes to quickly have their insurers contact American Family so that the Golkes would have coverage available to pay for the losses for which American Family was holding them liable.

¶ 55. American Family also had additional correspondence with David Golke, who responded to the March 13, 2000, letter. American Family sent David Golke and Indiana Insurance a letter on March 23, 2000, that, among other things, recommended an investigation of the fire scene because of the planned demolition on April 1, 2000.

¶ 56. Both the March 13 and April 6 letters provided reasonable notice of a possible claim and the basis for that claim. American Family expected the Golkes or their insurer to pay for the damages arising from their allegedly negligent work performed on a specific house, which allegedly caused a fire on a specific date at that house. The March 13, 2000, letter to both, and the March 23, 2000, letter to David Golke, explicitly noted the existence of relevant evidence, and provided ample time for the Golkes to inspect or schedule an inspection of the evidence before its destruction. The April 1, 2000,

deadline was in fact extended by at least ten days before demolition and rebuilding commenced, and according to American Family, "definitely" would have been extended upon request.[18]

¶ 57. We note that American Family did not own the home in question here. The family that did own the home should not be expected to wait indefinitely for the Golkes to inspect the home, particularly when the Golkes made no efforts to inspect or test the fire scene when presented with the opportunity to do so. American Family was placed in a difficult spot because of the Golkes' unresponsiveness, and it had a legitimate reason to destroy the home[19] and acted reasonably under the circumstances.

---

[18] The concurrence argues that the Golkes were not given a reasonable amount of time to inspect the evidence. *See* Concurrence, ¶ 73. But the concurrence ignores the unrebutted testimony that this deadline would have been extended upon request. Moreover, the concurrence forgets that, had Joseph and Charles Golke responded, their insurer surely could have arranged an inspection within the relevant timeframe. As for David Golke, his insurer initially denied coverage. This put the responsibility on David Golke to protect his rights, which he did not do. In short, the Golkes simply ignored American Family's communications. Contra the concurrence, they did have sufficient time to either inspect or schedule an inspection of the evidence.

[19] The concurrence makes it seem as though if American Family had only preserved certain parts of the home—the chimney assembly, fireplace, doghouse (a part of the roof), roof decking and joints, and part of the interior chase—all parties would have been satisfied. *See* Concurrence, ¶ 63. It is not clear why, however, just these specific parts would have been enough for the Golkes. This situation illustrates why a party may discharge its duty to preserve evidence. When a legitimate reason to destroy evidence exists, as here with the home, parties

¶ 58. Under the facts of this case, we conclude that American Family's March 13, 2000, letter, March 23, 2000, letter to David Golke and his insurer, and to a lesser degree the letter sent on April 6, 2000, provided sufficient notice and an opportunity to inspect the relevant evidence so as to discharge its duty to preserve the evidence. We therefore conclude that American Family's actions were reasonable, and thus no sanctions for spoliation were appropriate as a matter of law. Thus, the circuit court erroneously exercised its discretion in sanctioning American Family for spoliation.

## V. CONCLUSION

¶ 59. We conclude that the duty to preserve relevant evidence is discharged when a party or potential litigant with a legitimate reason to destroy evidence provides reasonable notice of a possible claim, the basis for that claim, the existence of evidence relevant to the claim, and a reasonable opportunity to inspect that evidence. We further hold that such notice can be properly effectuated by mailing a letter via first-class mail. We also affirm that dismissal is an appropriate sanction for spoliation of evidence only if a party acts egregiously—that is, in a conscious effort to affect the outcome of litigation or in flagrant, knowing disregard of the judicial process. Applying the law to the facts of this case, we conclude that as a matter of law, Joseph and Charles Golke received the March 13, 2000, letter, and that American Family provided the Golkes with reasonable and sufficient notice, thereby discharging its duty to preserve the evidence from the fire. The circuit

have an obligation to protect their rights when put on notice. The Golkes failed to do that here.

428

court therefore erroneously exercised its discretion when it dismissed American Family's suit. Because American Family discharged its duty to preserve evidence and no sanctions are appropriate, the judgment of the circuit court is reversed, and the cause is remanded to the circuit court for trial on the merits.

*By the Court.*—The judgments of the circuit court are reversed, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

¶ 60. SHIRLEY S. ABRAHAMSON, C.J. (*concurring*). The majority opinion concludes that American Family's actions in razing the fire-damaged house "were reasonable as a matter of law and so discharged [American Family's] duty to preserve evidence,"[1] such that no sanction is appropriate. Not so!

¶ 61. The record supports the circuit court's findings of fact and discretionary determination that American Family violated its duty to preserve evidence and may be sanctioned. Because American Family's conduct was not egregious, that is, because the conduct was not a conscious attempt to affect the outcome of the litigation or a flagrant knowing disregard of the judicial process, the circuit court erred in imposing the sanction of dismissing American Family's claim. But on its findings of fact and this record the circuit court could have imposed another sanction. I would remand to determine whether any sanction other than the sanction of dismissal is appropriate.[2]

---

[1] Majority op., ¶ 44. *See also* majority op., ¶¶ 5, 58–59.

[2] The circuit court held a bench trial relating to the Golkes' insurance coverage and to American Family's destruction of evidence. It did not rule on the coverage issue. I assume the

¶ 62. American Family's theory in the circuit court was that the Golkes, when doing work on the house's roof, negligently moved the chimney too close to combustible materials on the roof, which eventually caught fire. American Family, however, did not save *any* of the physical evidence relevant to its theory about the cause and origin of the fire and to its theory that the Golkes (as opposed to the original home builder) were responsible for creating a dangerous condition on the roof.

¶ 63. The circuit court found as a matter of fact that important parts of the fire scene "could [have] been easily preserved, could have been removed and could [have] been available for inspection and testing." The circuit court accepted the defense expert's testimony that American Family should have saved the chimney assembly, the fireplace, the "doghouse" (a part of the roof), roof decking and joists, and part of the interior chase, all of which would have fit easily in a garage stall. The circuit court also accepted the testimony of American Family's fire scene investigator, who testified that he could have preserved critical parts of the roof in a 10x10 foot area,[3] that he felt photographs were sufficient to document his findings about the cause and origin of the fire, and that he more than likely would handle the fire scene investigation differently if he were to conduct it today.

¶ 64. The circuit court found American Family's photographs inadequate. It accepted the defense

majority opinion's remand is for further proceedings related to coverage and to the merits of American Family's claim against the Golkes.

[3] Another American Family expert testified through a deposition that removal and preservation of physical evidence was not feasible and that the only way to preserve evidence of the fire scene was through photography. The circuit court did not find this testimony persuasive.

expert's testimony that the photographs did not permit an inference as to where the fire originated because the photographs were all of very small areas on or in the house, with no "medium view or overall view photographs of those same areas to place them in relation to the fire scene in general."

¶ 65. The circuit court also determined, after conducting a bench hearing with all evidence presented, that American Family's failure to preserve evidence caused significant prejudice to the Golkes. The circuit court concluded that American Family had "destroyed what is the crucial evidence that is important for the defendants to be able to evaluate the claim and to prepare and present a defense." The circuit court accepted the defense expert's testimony that due to the complete destruction of physical evidence, he could not form opinions about either the cause or the origin of the fire.

¶ 66. Having reviewed the evidence and made its findings, the circuit court ultimately determined that American Family's failure to preserve crucial evidence from the fire scene "is a clear case of spoliation every bit as bad" as the conduct that has warranted sanctions in other cases. The circuit court's determination that American Family violated its duty to preserve relevant evidence clearly was reasonable and is supported by the circuit court's findings of fact and evidence in the record.

¶ 67. The majority opinion properly acknowledges that "the ability of the party in possession of the evidence to bear the burden and expense of preserving it" is a relevant factor in the spoliation analysis.[4] Nevertheless, the majority opinion ignores the circuit court's finding of fact that American Family could have

___

[4] Majority op., ¶ 29.

preserved crucial evidence from the fire scene with minimal burden or expense.

¶ 68. The majority opinion also acknowledges that a party or potential litigant requires "a legitimate reason to destroy evidence."[5] The majority opinion does not explain—because it cannot explain—what legitimate reason American Family had for destroying every piece of evidence from the fire scene in the present case.

¶ 69. In short, the majority opinion turns a blind eye to the circuit court's findings of fact and discretionary determination that American Family acted unreasonably in failing to preserve any part of the fire scene, including the parts of the house that American Family's expert knew or should have known to be highly relevant to American Family's claim against the Golkes and to the Golkes' defense.

¶ 70. This court should uphold the circuit court's discretionary decision to sanction American Family for failing to act reasonably in preserving evidence.

¶ 71. Although dismissal is not the appropriate sanction in the present case, the circuit court nevertheless may impose a lesser sanction for American Family's failure to preserve any part of the house. A circuit court has "a broad canvas upon which to paint in determining what sanctions are necessary" in a spoliation case.[6] Courts have excluded evidence,[7] imposed a monetary

---

[5] Majority op., ¶ 5.

[6] *Milwaukee Constructors II v. Milwaukee Metro. Sewerage Dist.*, 177 Wis. 2d 523, 538, 502 N.W.2d 881 (Ct. App. 1993).

[7] *See Estate of Neumann v. Neumann*, 2001 WI App 61, ¶ 80, 242 Wis. 2d 205, 626 N.W.2d 821 (stating that the Wisconsin courts recognize the exclusion of evidence as a sanction in spoliation cases).

sanction,[8] or allowed "the trier of fact . . . to draw an inference from the intentional spoliation of evidence that the destroyed evidence would have been unfavorable to the party that destroyed it."[9]

*See also Howell v. Maytag,* 168 F.R.D. 502, 505 (M.D. Pa. 1996) ("Where evidence is destroyed, sanctions may be appropriate, including . . . the exclusion of countervailing evidence . . . ."); *N. Assurance Co. v. Ware,* 145 F.R.D. 281, 284 (D. Me. 1993) (excluding evidence as a sanction for the spoliation of evidence); *Hamilton Mut. Ins. Co. v. Ford Motor Co.,* 702 N.E.2d 491, 493 (Ohio Ct. App. 1997) ("In product liability cases where evidence is intentionally or negligently 'spoiled' or destroyed by a plaintiff or his expert before the defense has an opportunity to examine that evidence for alleged defects, a court may preclude any and all expert testimony as a sanction for the spoliation of evidence." (quotation marks and citation omitted)).

[8] *See, e.g., Turner v. Hudson Transit Lines, Inc.,* 142 F.R.D. 68, 77–78 (S.D.N.Y. 1991) (stating that "courts impose monetary sanctions for the destruction of evidence"; imposing a monetary sanction); *Harkins Amusement Enters., Inc. v. Gen. Cinema Corp.,* 132 F.R.D. 523, 524 (D. Ariz. 1990) (imposing a monetary sanction for the destruction of evidence); *Capellupo v. FMC Corp.,* 126 F.R.D. 545, 553 (D. Minn. 1989) (same).

[9] *Neumann,* 242 Wis. 2d 205, ¶ 81 (citation omitted).

*See also Schmid v. Milwaukee Elec. Tool Corp.,* 13 F.3d 76, 78 (3d Cir. 1994) ("Since the early 17th century, courts have admitted evidence tending to show that a party destroyed evidence relevant to the dispute being litigated. Such evidence permitted an inference, the 'spoliation inference,' that the destroyed evidence would have been unfavorable to the position of the offending party." (citation omitted)).

In *Nation-Wide Check Corp. v. Forest Hills Distributors, Inc.,* 692 F.2d 214, 218 (1st Cir. 1982), then-Judge Breyer (now Justice Breyer) explained the rationale underlying the "spoliation inference" as follows:

The adverse inference is based on two rationales, one evidentiary and one not. The evidentiary rationale is nothing more than the common sense observation that a party who has notice that a

¶ 72. The majority opinion does a disservice to the parties and to the law by ignoring American Family's failure to retain any part of the house as evidence. This is the main defect in the decision. Other parts of the majority opinion, however, deserve closer attention as well.

¶ 73. First, contrary to the majority opinion's holding at ¶ 58, a reasonable judge could conclude that American Family did not give the Golkes a reasonable opportunity to inspect the evidence in the present case before it was destroyed. American Family's March 13, 2000, letter to the Golkes stated that the house would be demolished on April 1, 2000—just 19 days after the letter was written.[10] The letter did not suggest that the April 1 deadline was flexible, although American Family's claims adjustor testified after the fact that he would have granted an extension upon request. During the 19 days between March 13 and April 1, the Golkes needed to contact and work things out with their insurers, to find and retain a fire scene investigator, and to make arrangements for the investigation. A lot to expect from the owners of a local roofing outfit![11]

---

document is relevant to litigation and who proceeds to destroy the document is more likely to have been threatened by the document than is a party in the same position who does not destroy the document. . . . The other rationale for the inference has to do with its prophylactic and punitive effects. Allowing the trier of fact to draw the inference presumably deters parties from destroying relevant evidence before it can be introduced at trial. The inference also serves as a penalty, placing the risk of an erroneous judgment on the party that wrongfully created the risk.

[10] Majority op., ¶ 9.

[11] The majority opinion identifies the "sophistication of the parties" as a relevant factor in the spoliation analysis. Majority op., ¶ 29.

¶ 74. Moreover, American Family ended up giving David Golke as few as nine days to retain a fire scene investigator and conduct the investigation. Upon receiving American Family's March 13 letter, David Golke did exactly what the letter told him to do: He promptly forwarded the letter to his insurance carrier.[12] David Golke did not know that he, rather than his insurance carrier, would be responsible for dealing with American Family until he received a second letter from American Family, dated March 23, 2000, informing him that his insurance carrier had denied coverage. The March 23 letter reiterated that the house would be demolished on April 1, 2000.

¶ 75. The majority opinion apparently concludes that as a matter of law it is reasonable to give a small businessman nine days to locate and hire an expert witness before losing the opportunity to inspect evidence that is critically relevant to a potential lawsuit against him. *See* majority op., ¶ 56 (stating that the March 23 letter to David Golke "provided ample time . . . to inspect or schedule an inspection of the evidence before its destruction"). I do not find the majority opinion persuasive on this point.

¶ 76. Perhaps sensing that a reasonable judge could take issue with American Family's narrow timetable, the majority opinion hedges its bets by declaring that the Golkes had an extra 10 days to inspect the fire scene because demolition of the house "did not begin until sometime after April 11, 2000."[13] The majority opinion, however, decides an issue of fact that the

---

[12] The March 13 letter stated in relevant part: "If you have a liability insurance carrier, please forward this letter to them and we will handle these matters directly with them."

[13] Majority op., ¶ 15.

circuit court left undecided. The circuit court stated that it "never heard testimony or official evidence as to the razed date" and "[did not] know what date the home was actually razed."[14]

¶ 77. Even assuming that American Family waited an additional ten days to demolish the house, this delay would not show that American Family's conduct was reasonable as a matter of law. American Family never told the Golkes that they had an extended period of time during which to inspect the fire scene. A letter that American Family sent to the Golkes on April 6, 2000, requested insurance information and neither stated nor implied that the fire scene was still intact or that the Golkes might still have an opportunity to inspect it.[15] American Family also failed to provide this information after Charles Golke called American Family on April 7 and left a message in reply to the April 6 letter. American Family's claims adjustor testified that he returned Charles Golke's call after business hours,

---

*See also* majority op., ¶ 56 ("The April 1, 2000, deadline was in fact extended by at least ten days before demolition and rebuilding commenced . . . .").

[14] American Family's claims adjustor testified that although he could not recall when the fire scene was demolished, he could infer from two documents in the record that demolition began no earlier than April 11, 2000. American Family introduced two internal reports indicating that as of April 11, 2000, American Family still had not contracted for the rebuilding of its insured's home. The claims adjustor stated in his testimony that he thought "[American Family] would not have given the okay to start the demolition without knowledge of the—what we were going to be paying out for the rebuilding process."

The circuit court neither accepted nor rejected the claims adjustor's testimony about his inference from the internal reports.

[15] *See* majority op., ¶ 12.

got no answer, and then made no further attempt to contact any of the Golkes until October 2000.

¶ 78. Second, the majority opinion fails to make clear that the method of notifying interested persons of the impending destruction of evidence depends on the circumstances of the case. In some circumstances first-class mail might be fine. In others, not.

¶ 79. Although the majority opinion relies upon statutes permitting notice to be made via first-class mail to justify the use of first-class mail in the present case,[16] the legislature does not always deem first-class mail an appropriate method of providing notice. Indeed, a computer search of the Wisconsin Statutes reveals that the phrase "certified mail" appears in 167 sections of the statutes, the phrase "registered mail" appears in 104 sections of the statutes, and the phrase "first-class mail" appears in only 18 sections.[17]

¶ 80. I am uncomfortable with any language in the majority opinion intimating that first-class mail is sufficient in all cases.

¶ 81. In any event I suggest it is wiser for a person who must give notice to use a method that provides written evidence that he or she actually did give the notice and that the recipient actually did receive the notice. Without such written proof a dispute may arise about notice, and the notifier, the recipient, and the courts will be faced with a set of presumptions that evolved in a different era and might not be realistic in the technologically-advanced 21st century.

---

[16] Majority op., ¶ 33.

[17] The text of the Wisconsin Statutes is searchable at http://nxt.legis.state.wi.us/nxt/gateway.dll?f=templates&fn=stats.htm (last visited June 30, 2009).

437

¶ 82. In sum, I would remand the matter to the circuit court to exercise its discretion in determining whether a sanction lesser than the sanction of dismissal should be imposed for American Family's failure to retain any physical evidence from the fire scene in the present case.

¶ 83. For the reasons set forth, I write separately.

¶ 84. I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.